LITTLE et al. v. HAAS et al.

Civil Action No. 2301.

District Court, N. D. Georgia,
Atlanta Division.

Sept. 26, 1946.

John I. Kelley, of Atlanta, Ga., for plaintiffs.

Herbert J. Haas, E. W. Moise, Thos. Howell Scott, James A. Branch, Hal Lindsay, Wm. G. Grant, Alston, Foster, Sibley & Miller, Spalding, Sibley & Troutman, Powell, Goldstein, Fraser & Murphy, and Ivey & Nathan, all of Atlanta, Ga., for defendants.

UNDERWOOD, District Judge.

This is a suit in two counts originally against seventy-eight defendants. Many have been dismissed so that now the case stands against only twenty-four defendants. Both plaintiffs sue in Count 1, but only Mrs. Little in Count 2.

The petition alleges that through the fraud and conspiracy of the defendants, plaintiffs have been damaged in large sums arising out of transactions involved in the merging into the Atlanta Laundries, Inc., of ten laundries located in or within the vicinity of Atlanta and in the disposition of the stock of Piedmont Laundry Company in which plaintiffs had derived an interest under the will of W. C. Cole.

### Findings of Fact.

W. C. Cole died in 1919 leaving a will under which C. D. Knight and Courtland S. Winn qualified as executors and acted as such to the date of the death of Knight on November 5, 1937, after which Winn, his surviving executor, continued to act until his death on March 8, 1940. Winn died testate leaving his widow as his executrix, but she renounced her right to act as his personal representative of the Cole Estate and thereafter died during the pendency of this suit. No one has been substituted as party defendant in the place of Winn or his widow and there is no qualified representative of the Cole Estate. Ga. Code Ann. § 113-1231; Burke v. Beall, 77 Ga. 271, 3 S.E. 155; Ballard v. Zachry, 54 Ga.App. 101, 187 S.E. 139.

At the time of the death of W. C. Cole he owned fifty (50) shares of the one hundred and fifty (150) shares, later increased to one hundred and sixty (160) shares, of the outstanding capital stock of Piedmont Laundry Company which he disposed of by Items 3, 4 and 5 of his will. At the time of his death he left only one child, plaintiff Mrs. Edith Cole Little, whose only child is Sam Cole Little, the other plaintiff. C. D. Knight was a half-brother of W. C. Cole and associated with him in the business of Piedmont Laundry Company.

Items 3, 4, 5 and 8 of W. C. Cole's will provide as follows, to-wit:

"Item III. I give, devise and bequeath unto my daughter, Mrs. Edith Little, for and during the term of her natural life, the income and dividend from sixteen (16) shares of the capital stock of the Piedmont Laundry Company; after her death, my executors hereinafter named shall sell said sixteen (16) shares of stock and divide the proceeds thereof among my heirs at law who are in life at the time of the death of my said daughter.

"Item IV. I give, devise and bequeath unto my nurse, Miss Mamie Calhoun, for and during the term of her natural life, the income and dividends on eighteen (18) shares of the capital stock of the Piedmont Laundry Company; after her death my executors shall sell said shares of stock and divide the proceeds thereof among my heirs at law who are in life at the time of the death of the said Miss Calhoun.

"Item V. I give, devise and bequeath unto my brother, C. D. Knight, sixteen (16) shares of the capital stock of the Piedmont Laundry Company, to have and to hold the same absolutely in his own right forever in fee simple."

"Item VIII. I nominate, constitute and appoint C. D. Knight and Courtland S. Winn, as executors of this my last Will and Testament. I direct that my said executors be relieved of making inventory and appraisement of my estate. They are also relieved from the necessity or requirement of making returns to any Court as to their acts or doings as such executors, and they are hereby empowered with full and complete authority to make any and all sales of any property of my estate as it may be necessary in administering the same, without obtaining the order of any Court

for making said sale. Said sales shall be either public or private, in the discretion of my executors. They may sell either for cash or credit, and on such terms and for such price and in such way and manner as in their judgment is to the best interest of my estate."

In 1926 Snowden McGaughey, for the Atlanta Trust Company, made an effort to effect a merger of some of the laundries in Atlanta. While so engaged he, in February of that year, employed Peat, Marwick, Mitchell & Co., to make and submit reports on their operations and paid them therefor. His negotiations failed and he stepped out of the picture.

Thereafter, in August, 1927, copies of these reports were turned over to Defendant Haas who secured options dated October 27, 1927, with the ten laundry companies later merged into the Atlanta Laundries, Inc. McGaughey had nothing to do with obtaining these options. The options were transferred by Haas to Defendant Robertson on November 14, 1927. He exercised them on November 16, 1927, by entering into separate merger contracts with the constituent companies.

The option to purchase Piedmont Laundry Company fixed the purchase price at $550,000 to be paid in cash, modified later by the merger contract to payment in cash and stock of the new company, and provided that application would be made to the Superior Court of Fulton County for authority to exchange the sixteen (16) shares of its stock owned by the Cole Estate for 680 shares of preferred and 1700 shares of common stock of Atlanta Laundries, Inc., which was to be organized. This was done and the Court authorized the exchange, said Atlanta Laundries, Inc., stock being accepted as $61,968 of the purchase price. The proceedings in the Superior Court were technically correct and the relationships of all participating parties were disclosed. The petition informed the Court of the by-law of Piedmont Laundry Company and of its waiver if the exchange of stocks should be authorized, which provided that:

"Article I, Stock, Paragraph 2—* * * No stockholder shall sell his stock without first giving all the other stockholders thirty days notice of his intention to sell. If any other stockholder shall offer the book value of such stock, the same shall be sold to him, or to the company, if the company desires to buy the same, otherwise it may be offered to the general public for sale."

The evidence shows that all the matters complained of as constituting fraud were disclosed to Fulton County Superior Court in the proceeding to authorize the exchange of stocks, except the fact that C. D. Knight received all cash and no stock for his interest in the Piedmont Laundry Company and the unproved allegation that the prospective financial condition of Atlanta Laundries, Inc., was not sufficiently presented. The petition to the Superior Court as amended, the answer of the guardian ad litem and the testimony given by the Executors Knight and Winn, presented the material facts to the Court. There was also disclosure of Haas' connection with Atlanta Laundries, Inc., and its promoters, and with the guardian ad litem of Sam Cole Little and his representation of the executors. The executors expressed the opinion that the exchange of the 16 shares of Piedmont Laundry Company stock for the Atlanta Laundries preferred and common stock would be "a very splendid transaction, as everybody did at the time" (Record, Vol. 4, p. 99). The evidence does not show that this was not an honest opinion. Plaintiffs claim that the financial condition of Atlanta Laundries was not adequately presented to the Superior Court, but there is no evidence to this effect and the Court will be presumed to have satisfied itself on this point before authorizing the exchange of stocks. It certainly will not be presumed without proof that this information was fraudulently withheld from the Court.

Knight explained his failure to take stock in lieu of cash by saying that he was old and in poor health and desired to retire from active business. He also desired his son to take his part of the stock. There is no evidence to show that he considered the stock valueless. On the other hand, he and all of his associates at the time considered the stock to be a good invest

ment (Record, Vol. 4, p. 99) and some of them not only took their interests in the constituent laundries in stock of Atlanta Laundries, but actually purchased more and paid cash therefor.

This is notably true in the case of Earl Knight, Martin, Heinz, Hudson and Todd (Record, Vol. 5, pp. 75-79; Vol. 7, p. 5; Vol. 14, p. 73; Rooke testimony, Vol. 13, p. 29 et seq.). Others valued the preferred stock at from $85 to $100 per share. J. H. Hilsman & Co., brokers, bought 50 shares of preferred, with 125 shares of common attached, at $84 per share (Record, Vol. 13, p. 30). It is true that certain stockholders of Atlanta Laundries, Inc., in later contesting income tax assessments, placed a lower value on said stock and some testified that it was valueless. However, the Board of Tax Appeals placed values, respectively, of $75 to $100 on the preferred, and of $2 to $15 per share on the common (Record, Vol. 5, p. 91; Vol. 14, p. 74; Plaintiffs' Exhibit #98). Income taxes were computed and paid on these valuations. Some shares were actually sold on the market for $100 per share for the preferred, including common stock that went with it (Record, Vol. 14, p. 73). Furthermore, the evidence showed that the Atlanta Laundries, Inc., paid dividends of 7% per annum on its preferred stock until the depression hit the Company, a period of two and a half years (Record, Vol. 3, p. 82). The dividends were paid out of profits after payment of fixed charges and without raising the price of laundry service (Record, Vol. 3, pp. 83, 84).

Mrs. Little, during the times dividends were paid, received $11,900, more than four times as much per annum from the Atlanta Laundries, Inc., stock as she received as dividends on the Piedmont Laundry Company stock (Record, Vol. 3, p. 86).

Looking backward, after the depression had paralyzed all business, the taking of stock instead of cash by the executors proved to be an unwise and tragic mistake. However, the evidence does not show that defendants, or any of them, at the time of the exchange of stock, knew or thought that the 16 shares of Piedmont Laundry Company stock were more valuable than the 680 shares of preferred and 1700 shares of common stock of Atlanta Laundries, or that they committed a fraud against plaintiffs. Mrs. Little consented to the petition which requested authority to make the exchange. The Court authorized the exchange by judgment dated January 14, 1928, reaffirmed on March 5, 1928, because of the improper service on Sam Cole Little. By subsequent order dated June 14, 1928, the acceptance of voting trust certificates in lien of 1700 shares of common stock was approved.

The merger contracts set out in Exhibit A thereto the capital setup which provided for the issuance of $1,500,000 of bonds, $500,000 of notes, and 19530 shares of preferred stock and 115,000 shares of common stock. The securities were issued as provided for in the contracts.

In the reports of Peat, Marwick, Mitchell & Co., to McGaughey the invested capital of the constituent companies, except American Laundry and Knight's Decatur Laundry not included, as shown by their books, was entered as $1,529,345.55. Adding the option prices of the two excluded laundries, plaintiffs fix the total invested capital of all the constituent companies at $1,979,345.55. This was not a statement of actual value or reproduction costs less depreciation or of sound value, but only a statement that the invested capital as shown by the books of the companies totaled this amount. It did not include any sum for good will or trade routes, but only purported to show book value of buildings, machinery and equipment.

Subsequently, upon employment by Robertson, appraisals of the properties of the constituent companies, except land, which was appraised by J. N. Malone, were made by American Appraisal Company. Later still, Peat, Marwick, Mitchell & Co., submitted a constructed balance sheet of Atlanta Laundries Inc., as of December 31, 1927, which stated that, "After giving effect as of that date to the acquisition of the businesses and certain assets and assumption of certain liabilities of a group of several companies, and the issuance, as consideration therefor, of its funded debt and capital stock to be presently outstand-

ing," the total assets, including "Land, buildings, machinery and equipment, based on net sound values as determined by American Appraisal Company as of December 1, 1927 (less subsequent depreciation), valued at $3,030,419.20 and 'trade routes,' as valued by American Appraisal Company," valued at $525,000.00," amounted to a total of $3,808,353.14.

Upon execution of the merger contracts, the Atlanta Laundries, Inc., was organized, bonds and notes were issued in the sum of two million dollars upon security of the assets secured from the constituent laundries, from the proceeds of which the cash purchase price and organizing expenses were paid, and the common and preferred stocks distributed to the constituent companies in accordance with their respective contracts. The contracts provided that all of the common stock should be placed in a voting trust for a period of ten years. The constituent companies all executed their contracts for the merger of the companies prior to the submission of the reports and audits of Peat, Marwick, Mitchell & Co., except those submitted to McGaughey, which contracts set out the terms under which the merger was to be made and the capital structure of the resulting company, Atlanta Laundries, Inc. These reports and audits were apparently made for the purpose of promoting the sale of the bonds and notes and not for the purpose of establishing the value of the stock of the company which was to be delivered in consideration of the assets of the constituent companies. These matters had all been previously determined and agreed upon between the parties. The reports and audits of Peat, Marwick, Mitchell & Co., and the appraisals of American Appraisal Company have been introduced in evidence by plaintiffs to show excessive write-up of assets and overcapitalization of Atlanta Laundries, Inc.

Plaintiffs contend that the machinery and equipment appraised by the American Appraisal Company were valued far in excess of their value and their actual cost to the constituent companies and that this was done for the purpose of justifying the capital setup already agreed upon by the promoters.

No evidence was introduced by plaintiffs to show that the values placed upon specific properties were incorrect, while on the other hand, the evidence shows that the appraisals were made with meticulous care, each item being considered by itself and valued after actual inspection. The values set up in the appraisal, as expressly stated therein, were in terms of reproduction costs new, less depreciation, and sound value. The fact that these values were in excess of the book entries of invested capital of the constituent companies reported by Peat, Marwick, Mitchell & Co., does not of itself prove the incorrectness of the appraisal. The evidence does not show how the companies arrived at "invested capital" as stated on their books. On the other hand, the evidence does show that in arriving at values the appraisal company did so by determining the cost of reproducing the properties new at the time of the appraisal and deducting therefrom actual depreciation as determined by it at that time. In arriving at cost of reproduction, the appraisal company examined architectural drawings of the plants, the quantities of materials necessary to construct the buildings, the cost of materials at Atlanta upon the basis of prevailing market prices at the time in carload lots and the cost of the labor necessary for the construction on the basis of wage scales prevailing in Atlanta. These prices were arrived at by local inquiries of labor unions, contractors, vendors of building material and supplies, and consideration of existing prices over the country as a whole. Actual depreciation was arrived at from an examination of the properties themselves, consideration being given to their age and condition and the extent to which they had been maintained. In appraising machinery and equipment, the Company ascertained the cost of replacement new by inquiries from manufacturers and from consideration of price indices available to it. Depreciation was determined from inspection of the articles themselves. The Company had no information concerning the values at which the various properties were carried on the books of the companies (Record, Vol. 14, p. 46) and did not itself appraise the land, this hav-

ing been done by J. N. Malone. Plaintiffs have not attempted to show that the appraisals were not made in this manner nor that this method of appraisal was incorrect or improper; nor have they attempted to disprove any value placed upon any specific article appraised, but to show fraudulent over-valuation of the assets of Atlanta Laundries, Inc., plaintiffs rely on the statement of Peat, Marwick, Mitchell & Co., made to McGaughey, in which they reported the invested capital as shown by the books of constituent companies, when amended by adding estimates of invested capital of American Laundry and Knight's Decatur Laundry, amounted to $1,979,345.55, while the corresponding entry in subsequent audits and appraisals of American Appraisal Company was $3,740,408.84, reproduction less depreciation, and sound value of $3,043,397.16, which, after adding $525,000 as the value of the trade routes, made a sound value of $3,568,397.16. Reliance is also placed upon opinions of certain stockholders as to the value or lack of value of their stock for income tax purposes.

■■■ The report of Peat, Marwick, Mitchell & Co. stated the item of $1,529,-345.55 as invested capital as shown by the books of the constituent companies, and not as sound value or reproduction cost less depreciation as set up in the appraisals. The evidence does not disclose any specific facts showing that these values, as so designated, were incorrect, nor how or of what date the "invested capital" was determined nor why it differed so widely from appraised sound values. The Court can not assume, especially in the light of the testimony showing how the appraisals were made, that they were fraudulent or incorrect. Fraud will not be presumed. The appraised values were made at the peak of a boom period and while they may seem excessive as compared with the "invested capital" which may have been determined in depressed times or fixed lower for other unknown reasons, they, as a matter of fact, may have been reasonable and fair in the light of conditions existing at the time. At any rate, to hold otherwise, in the absence of evidence and approximately twenty years after the event, would be merely to speculate. Another appraisal made by National Appraisal Company was called for by plaintiffs and made available to them, but they failed to make use of it or consent to its use by defendants (Record, Vol. 11, p. 42, et seq.). What it would have shown is not known. The Company may have been overcapitalized but this would not show the appraisals to be incorrect, or, necessarily and by itself, that defendants knew that the assets were grossly overvalued and used them to defraud plaintiffs. The actual values at the time may fully support the findings in the appraisal and yet their use to the company may not have been of this value, resulting in practical overcapitalization. But even if this be true, there would be no fraud against plaintiffs, if the parties charged with fraud believed that the combined assets of the constituent companies justified the capital setup or did not make use of their failure to do so to defraud plaintiffs. There is a difference between the intrinsic value of stock and its market or sales value. A stock of great intrinsic worth based on the value of its assets may for many reasons, perhaps because the management is a closed one or the scope of the business limited in kind or territory or subject to strong competition, have a market value much below its actual value. On the other hand, stock based on comparatively small physical assets might have a value far beyond its intrinsic value because of the value of its good will or the absence of competition or for many other causes.

Atlanta Laundries, Inc., was chartered in Delaware December, 1927, with authorized capitalization of 20,000 shares of $7 preferred and 150,000 shares of common stock, all without par value, and actually began operations January 14, 1928. Atlanta Laundries, Inc., filed a petition for reorganization under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, November 19, 1936, in which a final decree perfecting reorganization was entered October 11, 1938. Courtland S. Winn, as executor of the Estate of W. C. Cole, deceased, filed a claim based on 680 shares of preferred and 1700 shares of common stock held in Atlanta Laundries, Inc., for

which he was issued 697 shares of common stock in the reorganized company, the title to which. is now in the Cole Estate for disposition under the will of W. C. Cole.

### Conclusions of Law.

### Count I.

If the combined assets of the constituent companies were of the sound value found by the Appraisal Company, or of such value, together with the value of the good will of the companies and the advantages to be derived from their consolidation and single operation, as to fairly and substantially support values of its stock reasonably comparable to the value of the stock of the constituent companies for which they were exchanged, there would be no fraud against plaintiffs, since the Cole Estate would have received stock and cash equal in value to the 16 shares exchanged for the Atlanta Laundries stock and there is an absence of other significant evidence of fraud.

This may not be the case, but, because of the absence of evidence, plaintiffs have not carried the burden of proof of establishing excessive and fraudulent valuations for the purpose of defrauding plaintiffs as alleged in the petition.

On the other hand, if the combined assets of the constituent companies were only worth $1,979,345.55, as claimed by plaintiffs, a different situation would appear.

Plaintiffs contend that the value of the assets of the Atlanta Laundries, Inc., which were the combined assets of the constituent companies, was less than the bond and note indebtedness of two million dollars, the proceeds of which were used to make the cash payment for said assets. If this be true and there was fair distribution of cash and stock received by the constituent companies for their respective properties, then those receiving the cash together with bonus stock, if such, were not defrauded because they got all their interests were worth. No bond or note holder is complaining. Only stockholders who received no cash would be hurt. Plaintiffs fall in the latter category.

■ Plaintiffs allege that Piedmont Laundry Company did not receive its fair share of the cash and stock. The evidence does not support this contention and I find that there was no fraud in the apportionment of the cash and stock to Piedmont Laundry Company.

■ The constituent companies, respectively, distributed cash and stock to their own stockholders. This was a matter involving corporate management and each separate company was responsible to its stockholders for a fair distribution. Ga. Code Ann. § 22-1208; Atlanta Real Estate Co. v. Atlanta National Bank, 75 Ga. 40(1).

Piedmont Laundry Company apportioned its own distributive share to its stockholders in accordance with arrangements with them. The executors of the Cole Estate, with the approval of the Fulton County Superior Court, accepted stock for the distributive share of the Cole Estate in lieu of cash and stock. All other stockholders received part cash and part stock for their interests, except Todd who received all stock, and C. D. Knight, who received all cash, his share of the stock going to other stockholders and he receiving from them portions of the cash to which they were entitled. No one questions the transaction except plaintiffs who allege that the negotiations whereby the Cole Estate received all stock and no cash were fraudulent and that procurement of the judgment of the Superior Court approving the transaction was a fraud upon the Court.

■ Every stockholder of Piedmont Laundry Company had a right to demand and receive his proportionate share of cash and stock regardless of whether the stock had any value or not. Clarke v. Armstrong, 151 Ga. 105, 112, 106 S.E. 289.

■ If the executors had accepted cash and stock, in fair proportion to the interest of the Cole Estate, there would have been no fraud, if they had bona fide interposed no objection to the sale of Piedmont Laundry Company to Atlanta Laundries, Inc. They were not bound to object or vote against the merger, if they thought it a wise course to pursue. If they had objected and voted against same, it would not have, under the Georgia law, prevented the sale, since all other stockholders au-

thorized the sale and the executors represented only a minority interest. The right of a majority to sell is recognized under Georgia law. Ga.Code Ann. § 22-710; Head v. American Discount Co., 178 Ga. 208, 172 S.E. 459; Peoples v. Southern Chemical Corp., 194 Ga. 388, 21 S.E.2d 698.

Therefore, up to the time of agreement of distribution of the cash and stock received for Piedmont Laundry Company, no fraud nor conspiracy to defraud plaintiffs was shown, nor any fraud upon any of its stockholders, since the full value of Piedmont Laundry Company assets was received, even though the stock might represent merely a bonus over and above the value of the assets represented by the cash.

The fraud, therefore, if any, arose out of the failure to allot to the Cole Estate its proportionate share of the cash received, and out of the consent of the executors, who accepted all stock and no cash for its interest, and the procurement by them of the order of the Superior Court authorizing such action.

If fraud be absent, error of judgment in making an authorized investment would not render the executors liable for loss. Marshall v. Citizens & Southern National Bank, 54 Ga.App. 123(5), 130, 187 S.E. 240.

An investment by a trustee which has been authorized by the Superior Court can not be attacked on the ground that the investment was unwise. Marshall v. Citizens & Southern National Bank, 54 Ga. App. 123, 187 S.E. 240.

In Georgia, a trustee must invest only in securities authorized by law, unless express permission of the Superior Court is obtained for investment in other classes of securities. Ga. Code Ann. § 108-417; Rogers v. Dickey, 117 Ga. 819, 45 S.E. 71; Clark v. Clark, 167 Ga. 1, 144 S.E. 787; Mobley v. Phinizy, 42 Ga.App. 33, 155 S.E. 73.

Such permission if lawfully obtained protects trustees in the purchase of a security sanctioned by the court although the securities are not within the class authorized by statute. Franklin v. McElroy,

99 Ga. 123(1), 24 S.E. 975; Baldy v. Hunter, 98 Ga. 170(2), 25 S.E. 416, affirmed 171 U.S. 388, 18 S.Ct. 890, 43 L.Ed. 208.

In this case permission was obtained and the question is, was a fraud perpetrated on the court in securing same? If the court exercised its judgment after full disclosure of all the material facts, another court in a collateral attack could not say its order was obtained through fraud. The evidence does not show fraudulent withholding of any material facts from the Court or any other fraud upon the Court. American Surety Co. of New York v. Adams, 190 Ga. 575(3), 10 S.E.2d 30; Johnson v. Mississippi Power Co., 5 Cir., 68 F.2d 545.

The evidence is insufficient to show fraud or conspiracy to defraud plaintiffs as alleged in Count 1 on the part of defendants, or any of them, and a decree will be entered in their favor.

### Count 2.

On March 31, 1927, Miss Calhoun having died prior thereto, the executors of the Cole will, with the written consent of plaintiff, Mrs. Little, after having had the transaction and the handling of it fully explained to her, sold the 18 shares of stock referred to in Item IV of the will to Piedmont Laundry Company for $1,000 per share, or $18,000.

The by-laws of the Piedmont Laundry Company contained a provision that a stockholder who desired to sell his stock must first offer it to the company and other stockholders who were privileged to buy at the book value of the stock regardless of its value. The book value of the stock at the time was $1,405 and the stockholders and the number of shares owned by each were:

| | |
|---|---|
| C. D. Knight | 66 shares |
| V. F. Todd | 5 shares |
| T. A. Martin | 50 shares |
| Earl Knight | 5 shares |
| Cole Estate | 34 shares |

All of the foregoing and C. D. Knight and Winn, as representatives of the Cole Estate and Mrs. Little, were present at the time of the sale of the 18 shares of stock.

The evidence is silent as to what was actually said at the time of the sale and no facts were proved to show conspiracy or fraud on the part of the participants, unless, as claimed by plaintiffs, the price paid for the stock was greatly inadequate and the negotiating parties, who occupied a fiduciary relationship to plaintiffs, fraudulently concealed or withheld material facts known to them and undisclosed to plaintiff, Mrs. Little, as to the value of the stock greater than the price paid for it.

This transaction took place when there was no pending proposition or options for the merger of the various laundries and there is no evidence that any of the defendants, other than those present at the time of the sale, knew anything about the transaction or had any part therein. No recovery can be had against them and judgment is rendered for them, so that the only question remaining is whether or not the evidence shows fraudulent acts on the part of said executors and Piedmont Laundry Company and its stockholders.

The stock in the Piedmont Laundry Company was closely held. Under the provisions of the will it could not be transferred to Mrs. Little but had to be sold by the Executors and the proceeds delivered to her. There was no evidence that the stock had any established market value, but the contrary was shown, and also that none of the stock had ever been sold (Record, Vol. 5, p. 82). The parties to the transaction testified that the price paid for the 18 shares of stock was, in their opinion, a good and fair price for same at the time (Record, Vol. 5, p. 81, 82) and there is no evidence that any higher price could have been received. Mrs. Little was present when the transaction was closed and consented thereto in writing.

The question is whether or not the stock was worth more than $1,000 per share, and if so, whether the parties responsible for the negotiations knew that it was and that it could be sold for more than this amount and concealed these facts for the purpose of defrauding Mrs. Little.

If fraud be not shown, any action based on the transaction is clearly barred by the statute of limitations. If fraud existed, it would likewise be barred if Mrs. Little discovered the fraud and failed to prosecute her claim within the statutory period after such discovery.

Other than the Cole Estate, there were only four stockholders of the Piedmont Laundry Company at the time the 18 shares of its stock were purchased by it from the Estate. C. D. Knight was its President and dominant in the affairs of the Company, as well as co-executor of the Cole Estate and half-brother of W. C. Cole and half-uncle of Mrs. Little.

The other three stockholders were active in the administration and operation of the Company and fully conversant with its financial condition.

At the annual meeting of the stockholders of the Company held on January 10, 1927, a profit and loss statement of the Company as of December 31, 1926, was submitted, considered by the stockholders, and incorporated in the minutes of the Company. This statement showed the sum of $262,378.96 undivided profits and surplus. This, if correct, would show undivided profits of $1,639.87 for each of the 160 shares of stock.

At a meeting of the stockholders on March 30, 1927, a resolution was adopted which authorized and directed the proper officers of the Company "to purchase for and in the name of Piedmont Laundry Company, from Courtland S. Winn and C. D. Knight as Executors of the Last Will and Testament of W. C. Cole, deceased, 18 shares of the Piedmont Laundry Company, at and for the sum of $18,000.00 cash, said shares of stock if and when purchased by said Piedmont Laundry Company, being purchased not for the purpose of being extinguished or retired, but for the purpose of being held and owned by said Piedmont Laundry Company and being reissued or resold by it."

Somewhat later negotiations were entered into with Defendant Haas for option to purchase the Piedmont Laundry Company and the Board of Directors, at a meeting held October 6, 1927, authorized the President, C. D. Knight, and the Secretary and Treasurer, V. F. Todd, "to sign such option as soon as all details have

been worked out satisfactorily between Mr. Knight and Mr. Haas."

The option was agreed upon and signed on October 16, 1927. The option called for the sale of Piedmont Laundry Company for a consideration of $550,000 cash. This was on the basis of $3,437.50 per share of the 160 shares (including said 18 shares) of the stock of the Company. Later the agreement was changed so that the consideration to be paid was $330,000 cash and 2420 shares of preferred and 6050 shares of common stock of the Atlanta Laundries which was to be organized.

Even if the stock was absolutely worthless, which was far from being the case, the cash consideration to be received alone showed a valuation of $2,062.50 per share.

■ The facts proved showed such a gross inadequacy of consideration for the 18 shares of stock sold as to amount, together with the other facts proved, to fraud in the transaction. Hoyle & Abbott v. Southern Saw Works, 105 Ga. 123, 31 S.E. 137; Dyar v. Stewart, 5 Cir., 123 F.2d 278; Lowenstein v. Reiks, 2 Cir., 60 F.2d 933, certiorari denied 287 U.S. 669, 53 S.Ct. 315, 77 L.Ed. 577.

All of these facts were fully known to the Piedmont Laundry Company and its directors and stockholders who occupied a fiduciary relation to Mrs. Little. Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281.

While these negotiations for the sale of the Company took place subsequent to the sale of the 18 shares of the Cole Estate stock, nevertheless, they throw light on the value of the stock at the time of its sale and the knowledge of the stockholders. They were all so intimately associated with and had such knowledge of the affairs of the Company, that they must have known that the value of the stock was greatly in excess of $1,000 per share and that the price was grossly inadequate. The papers were all drawn up by the executors and officers of the Company and presented to Mrs. Little for her consent as a completed document. There is no evidence that any representations were made to her as to the value of the stock, but the stockholders testified that they considered the amount offered reasonable and fair.

In the facts of this case, the stockholders and the executors occupied a fiduciary relationship to Mrs. Little, especially in view of the fact that the executors were closely connected with the Piedmont Laundry Company and were acting both as executors and as officer and attorney, respectively, of the Laundry Company. As fiduciaries, it was the duty of the officers and stockholders and executors to disclose material facts within their knowledge relating to the condition of the Company and the value of its stock and their failure to do so amounted to legal fraud. Morris v. Johnstone, 172 Ga. 598, 158 S.E. 308; Crosby v. Buchanan, 23 Wall. 420, 23 L. Ed. 138; American National Bank v. Fidelity Co., 131 Ga. 854, 859, 63 S.E. 622, 21 L.R.A.,N.S., 962.

Mrs. Little had the right, in consenting to the sale, to rely upon the good faith of the fiduciaries and the expectation that they would not defraud her by the purchase of the stock for a grossly inadequate consideration.

While the Company had the legal right to purchase the stock at its book value, $1,405, nevertheless, since they paid less than this amount, they were not relieved of the legal duty to disclose facts within their knowledge which would show that the value of the stock was far greater than the price agreed upon and that in view of the actual value of the stock she should receive at least the book value thereof.

■ If she had received the book value of the 18 shares of stock, she would have received $7,290 more than she actually received and she was damaged by the fraud imposed upon her in this amount.

Unless her cause of action is barred by the statute of limitations, she would be entitled to a judgment against the Piedmont Laundry Company, V. F. Todd, T. A. Martin, and the estates of Earl Knight and C. D. Knight. No judgment could be rendered, even if the evidence justified it, against Winn's Estate, since it is not represented in this proceeding.

This brings us to the question as to whether or not the statute of limitations

556

is applicable and whether the plea of the statute is good.

The date of the sale of the 18 shares of stock was March 31, 1927. The date of the option for the sale of the Piedmont Laundry Company to Atlanta Laundries, Inc., which recited the purchase price therefor, was October 7, 1927, while the merger contract, which named the purchase price of Piedmont Laundry as modified, was entered into November 16, 1927. Mrs. Little consented to the petition for authority to exchange the 16 shares of Piedmont Laundry stock for Atlanta Laundries stock on December 17, 1927. It fully disclosed the values placed upon the stock and the amount of cash that was to be paid. She received the first dividend from the Atlanta Laundries, Inc., on July 2, 1928, and the last on July 1, 1930.

It appears from these dates that Mrs. Little had knowledge or could easily have obtained knowledge of all the facts which would advise her of her cause of action against the Piedmont Laundry Company and its stockholders and the executors of the Cole Estate, as early as December 17, 1927, if not earlier.

The statute, therefore, covering the cause of action set out in Count 2, began to run, if not earlier, from December 17, 1927, when, it would seem, that facts were fully disclosed to her in the Superior Court proceedings which advised her of exactly what cash and stock or what stock of Atlanta Laundries would be exchanged for the 16 shares of Piedmont Laundry Company upon the merger in the event the exchange was authorized. From this she discovered, or could have discovered that, even if the stock of Atlanta Laundries was excluded from consideration, the cash payment alone on each share of stock would have been $2,062.50. Comparing this with the price of $1,000 per share which was paid her for the 18 shares of stock only a few months earlier, she could readily determine the inadequacy of the sales price of the 18 shares of stock and the fraud imposed upon her.

This suit was not filed until August 17, 1940, nearly thirteen years after the disclosure of facts which appeared in the Superior Court proceedings and information received from other sources. Therefore, the statute of limitations had long since run before the filing of the suit, Ga. Code Ann. § 3-807, and the plea of the statute of limitations in this case is good and decrees should be entered accordingly.

The findings of the Court being for the defendants on both Counts 1 and 2, it is ordered that decrees be prepared and submitted to the Court for signature within 10 days in conformity with these findings on the two counts, respectively.